This is our first case in the morning, 4-10-0-6-0-7. Leischner v. Advance Stores Company. We'll have the appellant, Mr. Gregory, for the appellee. Mr. Varney, you may proceed. My name is William Gregory. I'm here on behalf of Aaron Leischner, the plaintiff appellant in this matter. As the court is aware, Mr. Leischner has raised three issues on this appeal. The first issue is in regards to the court's denial of the plaintiff's request that Juror Kirkwood be stricken for cause. Essentially, what had occurred in this matter is that Juror Kirkwood explained to the court and the counsel that he, in fact, would be biased against the plaintiff. And specifically on page 14 of my initial brief, I cited a portion of the questioning between the court and Mr. Kirkwood, where the court explained to Mr. Kirkwood, you said that the judge stated that you recognize what I've already mentioned before, which is the plaintiff would bear the burden of proof, which is a preponderance of the evidence more probably true than not. Are you indicating that you would hold the plaintiff to a higher standard? To which Mr. Kirkwood responded, yes, I would. Yes, I would. And that's why I'm saying I would have a bias. I would, you know, you would really have to show me that somebody was really hurt and it was no fault of their own. And so this is initially, I mean, I understand that the court continued to question him in regards to this, but this was Mr. Kirkwood's initial statement to the court as far as his view or his state of mind is how I would clarify it. And we cited the case of People v. Cole. And that's a criminal case where it talks about the defendant's guilt. But the court said if the juror has previously expressed a fixed opinion, in that case as to the defendant's guilt, of course, the statement on board your examination that he can give the accused a fair and impartial trial must be judged in light of the opinion which he previously expressed. He expressed a fixed opinion. He said, I am biased. Yes, I am. I am biased against the plaintiff. The plaintiff has to prove this to me more than just meeting the preponderance of the evidence standard. He has to prove it to me. And in fact, he also has to prove to me that this accident was of no fault of his own. And neither of those statements are in line with the law and what the court instructed him as far as how to make this decision. And so it's our opinion that he did, in fact, express, obviously, a clear opinion in regards to a bias and that that opinion was never recanted, that his state of mind was never recanted. Counsel, I think, wouldn't it be fair to say that Judge Straczynski, during his questioning of this juror, basically rehabilitated him in terms of moving him off his fixed opinion that he began with? I would disagree with that. I mean, there were some general questions where he said, you know, if you take your, you know, obviously, this is not a situation that involves your daughter that we've discussed. You know, if you're talking about a general situation that doesn't involve your personal opinions, is it possible that you could do it? I mean, I think he said, OK, I understand that this is not my case. This is not the case I was involved in previously and that there's a different standard here. And I understand that I would try. But even when he did make the statements that said, I would try or I would give it my best shot, he always came back and clarified that. You know, I mean, at one point, you know, and Mr. Varney references this portion in his brief and the fact that he said that both sides would have to make a good case. You know, but he goes on. But then he goes, but what I'm saying is I don't have sympathy for a plaintiff until it's proven to me that it was through no fault of their own. And so, I mean, even when he was going through the rehabilitation, I mean, Mr. Kirkwood was still kind of backtracking and just saying, well, yeah, I think I can do that. But there's still this bias that I have. And they're still going to have to prove to me that it was no fault of their own. They're still going to have to prove to me, you know, in a clear and convincing way that they're entitled to this. They're still going to have to do more than just the preponderance of the evidence. They're still going to have to go above and beyond that. And he never recanted that. Were you trial counsel? Yes. Was there a shortage of jurors available? No, there were not. You know, so I mean, I understand that there were answers that he gave that to general questions were the appropriate answers. But those answers never changed the fact that he stated a bias. And they never changed the fact that he continued to state that the plaintiff would be held to a higher standard than what the judge had instructed him that would be applicable in this case. And he never went back on the statement that, you know, I'm not going to do this unless the plaintiff comes and proves to me that this was all due to no fault of his. You know, that that is part of my preset state of mind is that if I hear that this might be partially due to the plaintiff's own actions, then I have a bias here. I have a bias against the plaintiff because I don't believe that a plaintiff should be entitled to damages unless the injuries were a result of no fault of his own. And I don't believe that he ever, ever went back and changed that. And every time that the court went through and gave him the opportunity, he would make statements such as, I think I might, but. Or I can try, but. Or I'll give it my best shot, but. And so there was never any certainty in his statement that his bias was not going to apply. And he clearly stated a bias. And so therefore, we believe that it was improper for him to be allowed to sit on the jury because of that fact. And obviously, you know, when you look at the jury's award and what the jury awarded, we also believe that that verdict reflects the bias that Mr. Kirkwood stated. I mean, he didn't say that he had preset limits in his mind. But the other thing is he discussed preset limits. I mean, one of the things that he threw out there was, I'm not going to give X amount of dollars for this injury. And it just so happens that what he threw out was a broken, I think he said a broken leg. I mean, and part of the facts of this case were a broken ankle. I mean, it just fit too closely in regards to the biases that he stated. So therefore, we do believe that it was improper for the court to have allowed Mr. Kirkwood to sit as a juror in this case. And we do believe that Mr. Kirkwood's bias affected the jury's award in this case. The second issue that we raised was the, we cited the Daly case in regards to what we believe is that the jury's verdict was minimal in regards to, in proportion to the damages that we believe the plaintiff proved. And one of the things that Mr. Varney pointed out in his brief was the fact that it has to be uncontradicted evidence. And that it's the defendant's position that they provided evidence to contradict the plaintiff's evidence. But I would just like to state for the court that some of the undisputed facts, because I mean, Dr. Cortese clearly testified that the plaintiff fractured his ankle. And the plaintiff stretched the tendons in his ankle, causing the tendons in his ankle to become loose, creating an instability in his ankle. He testified that because of the fact that those tendons are now loose, they slip over the edge of his bone, causing a clicking sensation in his ankle, which the plaintiff can hear, but also contributes to the instability. And that because of that, he now has to wear a brace on his ankle. And in fact, the plaintiff testified that he has been wearing a brace on his ankle, essentially, since the day that this accident happened, up until the date of trial. And that he continued to wear the brace, and that he was going to continue to wear the brace, and that there was no brace required. But if you look at both Petroff and Cortese's testimony, they both agree that the plaintiff never had a prior problem with his ankle. Both of them completely agree with that. They both agree that prior to the December 5th date, which is the date at issue between Petroff and Cortese, that the plaintiff's ankle was completely immobilized. I mean, Dr. Cortese was treating this as a broken ankle. And he put it in a cast. He put it in a cam walker. He put it in anywhere it was completely immobilized. He couldn't move his ankle. There was no possibility of that ankle moving back and forth. And that on December 5th, when that cast was removed, that while the plaintiff was not complaining of pain on that date, he was still complaining of awkwardness, which Dr. Cortese described as instability. And that Dr. Cortese was requiring him to continue to wear a brace. And Dr. Petroff does not dispute that fact. Dr. Petroff and Dr. Cortese both agreed that he had no clicking sensation in his ankle prior to this accident. They both agree that the clicking sensation does exist. And they both agree that the clicking sensation that he's experiencing in his ankle is a permanent condition. Now, again, that clicking sensation is the result of the tendon being loosened and going back and forth over the bone. Both doctors absolutely agree that that is a permanent condition that he did not have before this accident, that he experienced a month after the accident, or actually less than a month after the accident, after his cast and his cam walker and all of the items attached to his ankle that made it immobilized allowed his ankle to be able to move is when the plaintiff, when Mr. Lester, noticed that clicking sensation. And both of them agreed that the clicking sensation was the tendons moving over the ankle. So I mean, the evidence is clear that Mr. Lester suffered a permanent injury because of this. I mean, that clicking sensation, those tendons were not damaged before this accident. There's absolutely no evidence to that fact. The evidence is that this is a permanent condition to which Dr. Cortese continues to require him to use a brace. He didn't have to use a brace beforehand. Now he has to use a brace on his ankle every time he's doing anything that requires any type of physical exertion if he's at work, if he wants to participate in any type of sport activities or anything along those lines. And so, I mean, you've got a situation where he was awarded less than $2,000 for a permanent injury. And I understand that Dr. Petroff, he made a statement that it was his opinion that the injury resolved on December 5th. But he also made statements that the clicking was not there before, that the clicking was permanent, and that the clicking was the exact injury to which Dr. Cortese was explaining as far as what occurred on the date of this accident. And so we believe that based on the fact that there are undisputed facts that Mr. Lester suffered a permanent injury because of this accident, that $2,000 cannot be exactly what Daley talked about, and that such a minimal verdict cannot stand based on that evidence. So therefore, the second reason that we're asking the court to reverse the trial court's findings is because of the fact that the minimal verdict does not support, is against the manifest weight of what plaintiff's injuries truly were. Finally, the final issue that we raised was in regards to contributory negligence. And there's no dispute that the defendant raised the issue of contributory negligence. There's no issue that the jury was properly instructed that that was one of the defendant's arguments. I mean, we're not disputing that. We're not here to say that they shouldn't have been instructed or that they were improperly instructed. What we're here to say is that their finding of contributory negligence is completely unfounded in the evidence. In Mr. Varney's brief, he cited three basises that the jury could have relied on in order to find that the plaintiff was contributory negligent. The first was Mr. Lester was in the auto parts store to buy three quarts of oil. When he bought the quarts of oil, he put them in his hand. He didn't get a bag. He didn't put them in a bag. He was just carrying them in his hand. Their first argument is that the jury could have believed that Mr. Lester was contributory negligent because of the fact that he didn't put them in a bag. I don't see how that would possibly lead to a finding that a person was contributory negligent. If he's holding the bag, I mean, the fact is he's walking through a door that has a metal strip on the bottom of it, one to, I think it was one and a quarter inches wide. I mean, if he's carrying that bag, that puts the oil even lower. I mean, it's not in his hand. Now it's lower, so it's going to be even more of a distraction or more of a, it would block his view more of what was at his feet if he's got something that's down there closer to his feet. The other thing is that, obviously, the door blocked his view anyway. I mean, even if he was looking straight down, he wouldn't have seen the hole until as he was stepping into it. So I mean, there's no evidence that by failing to get a bag that that contributed to his injury. The other thing is that the plaintiff was not watching where he was going. But that, again, there's no evidence that the plaintiff was not watching where he was going. Plaintiff's evidence is, I'm walking out the door. I'm pushing the door. I'm looking straight ahead. I'm looking out the door to see where I'm going. I don't see how that's possibly evidence that he was not watching where he was going. The fact is that that's exactly what he was doing. He's watching where he's going. He can't see what's hidden behind that door anyway. So why would he be looking there? He should be looking in. He's looking out the door, looking where he's going. I believe his actual testimony was, I was looking to make sure somebody wasn't coming in the door so I wouldn't hit them or run into them. So I believe that he was watching where he was going. The final thing is that he was walking on his ankle after the accident. I mean, first of all, in that regard, I mean, it's after the accident. So it wouldn't have contributed to the accident. And secondly, there's no doctor's testimony or evidence of the fact that he walked to his truck and then drove home and then drove to the doctor. And the fact that by him walking to his truck and walking from his truck to the door of his house, back to his truck and into the doctor's office, there's no evidence that that aggravated his injury in any way. So therefore, we do not believe that there was any evidence that Mr. Leshner was negligent in this case. And therefore, we would request that this court reverse the trial court's findings. Thank you. Thank you. We'll hear from you on rebuttal. Mr. Varney? Mr. Court, counsel, I'm Bob Varney, representing the defendant, Applee Advanced Auto. And the plaintiff's counsel has presented three issues on appeal. I believe none of them have overcome the manifest way to the evidence of the jury determination. I was trial counsel at the court below in handling this case. I'll address the issue raised by the plaintiff nor their presented unless the panel wishes otherwise. As far as Juror Kirkwood is concerned, the testimony begins volume four of the record on appeal, page 168, back and forth with questioning. I believe the record shows that Juror Kirkwood was very candid in that he had a prior bad experience with a lawsuit when his daughter was involved in an accident. And he was told by the police officer on the side that you better have good insurance, because even though these people didn't go to the hospital, didn't go to the emergency room, they're going to sue you. And the police officer was right. But as Justice Appleton pointed out earlier, I believe that Judge Brzezinski successfully rehabilitated him. In fact, asked the question on page 192. And so while you do have certain predispositions, life experiences, if you would, as you come into court, do you feel that you would be able to go ahead and divorce yourself from your personal situation and decide this case solely based on the facts as you would determine them to be and the law as the court would instruct you? To which the respondent, yeah, I think I can, if it was well presented. I mean, you've got to sell me, you know, but yeah, I could do that. Judge Brzezinski followed up, you would hold the party to their burden of proof? Answer, right. It just goes to show that based on his past life experience, he needed to make certain that the parties met their burden before he could decide one way or the other. And he referred to both parties having the burden in proving their case. One question would be why the need to spend the time with this juror. It doesn't sound like a juror who's just trying to get out of ever serving jury duty. Instead, it sounds like a juror who had a prior experience and is candid. Why take the time and cause any question? Unfortunately, in today's jury, no jury comes in with an absolute clean mind or no prior life experience. What occurred during the general questioning by Judge Brzezinski, was anyone involved in a lawsuit? Mr. Kirkwood raised his hand. What happened? My daughter got rear-ended. Fine. We'll talk to you later. Judge Brzezinski made certain that anything that the prospective juror, Kirkwood, had to say would not taint the rest of the jurors. And because of that, he brought him out and questions were asked. Judge Brzezinski went through, asked his questions, felt satisfied with his response, looked at plaintiff's counsel, and said, is there a motion to challenge for cause? At which the plaintiff said, yes, there is. Asked questions. Then I asked questions. So it's kind of a follow-up outside the presence of jury. When you look at it with a spotlight, it seems like this was the biggest issue in the case. In reality, it was probably a five or 10-minute position. We also talked with a couple other jurors who related to the plaintiff, which challenge for cause was granted on that, too. Were peripheries gone at that time? That's an excellent question, too. We were on the second panel that day. We were on the second panel. We had 14 in the box. We were going through these questions. And what happened with this juror? We handled the first two for cause, as far as the plaintiff's relatives were concerned. There was an agreement by both sides to go ahead and let those folks go. Then we had Mr. Kirkwood on the stand. We went through. The argument was heard. The challenge for cause was denied. And then what happened, that was the only questioning we had outside the jury. So then another juror was seated into the prior panel of four, Mr. Manning. And right the page after the challenge for cause was denied with Juror Kirkwood, the plaintiff exercised his last peremptory to get rid of Mr. Manning, who was a property claims manager for State Farm and said he could be fair, said he could hear the evidence. And the panel is well aware in Bloomington, Illinois, you're not going to have a jury without some country companies from State Farm. So we also made the argument, people versus Garcia. The fact is that this appeal, with respect to Juror Kirkwood, it's a condition for the panel to consider is that the plaintiff's counsel still had a peremptory. And Juror Kirkwood, I believe, was number seven. It's nice, this day and age, you get a nice listing of who's coming up, when they're coming. You get a copy of their card coming in, so you can ascertain who's coming in there, too. And I believe at the end of the day, we picked a jury of 12 with one alternate. There were two jurors filled in behind Juror Kirkwood. So for me, I could see that Juror Kirkwood would be coming down the road. It's a decision you make at trial level, whether you use a peremptory on someone like that, but there was one available for the plaintiff's counsel. And then finally, at the end of the day, was your answer to Justice Connacht's question in that there was a peremptory left? There was a peremptory. Plaintiff had a peremptory left. And it's on page 200, volume 4, the very next page, after the challenge for a cause was denied, plaintiff exercises peremptory on Manning. And I cite People v. Garcia. That case is factually different in that there was a complaint by the prosecution that a juror was unfair, but they did not use all their peremptories. And they say that itself is not controlling, but it's a factor to consider. But I think that helps put the big mix of what the plaintiff has spotlighted on a very narrow issue in the jury selection on there, too. As far as the second issue is concerned, the jury expert can stand based on the evidence presented. The juror found exactly what defense expert Dr. Petrov thought, has testified to, that this was an ankle strain. The plaintiff was claiming an abulsion fracture that a piece of a ligament that goes on the outside of the ankle by the bony prominence pulled off some of the bone. Dr. Petrov testified that it was an obstacle. I didn't even know what this was until he looked at the records. But apparently, the plaintiff had a congenital defect, that there are small bone fragments that are apparent on the left ankle and the right ankle. They're smooth, they're round. It was Dr. Petrov's opinion that this was not an ankle fracture, that this was a pre-existing congenital condition. Based on the fact that the treating doctor, Dr. Cortese, stated that the plaintiff had no pain December 5, roughly two weeks after the accident, and could return to work, Dr. Petrov opined, among other reasons, that this was an ankle sprain that fully resolved, good prognosis, no future arthritis, no future surgery. As far as this clicking is concerned over the ankle, he said that was the tendon. It's similar to cracking your knuckles, and should be pain-free. So what the jury determined, and actually it's pretty precise in here, they awarded the amount of medical bills for the emergency room, for the x-ray, for Dr. Cortese's, two or three visits. They awarded pain and suffering. I think plaintiff counsel, or my objective, asked for per diem, $15 a day. It was up to 10 days. They gave him $150, pain and suffering. And then they also gave him lost wages for that 10-day period. What was important, and I think adversely impacted the plaintiff's credibility, at the trial, he testified that he went back to work, he could work, he worked for a couple more weeks, and then was fired because of the injury. We called his former supervisor, Ms. Hanson. She came and she testified, Target has a 90-day review. He's approaching his 90-day period. He was fired because of his leadership, lack of leadership ability. And the fact that he missed those seven to eight days of work had nothing to do with it. I believe, personally, that greatly hurt the credibility of the plaintiff's case, his request for damages. As far as the third issue is concerned, dealing with comparative fault, the testimony was such that he never looked down. He never saw where he was stepping. He worked at this advanced auto store from 1998 to 2003, then relocated to Arizona. He came back, and from the spring of 2005 until November of 2005, would go to the advanced auto every other week to pick up parts, see if he could get a part-time job, but always used the same east entrance that the plaintiff used. He claimed it was a terrible crack condition, that there was a divot six to eight inches, four inches wide, half inch in there, but he never looked down. He could never testify as to what the condition of the sidewalk was at any point in time from 1998 all the way up to the day of the accident. The accident occurred when he was leaving the store, the very same entrance he came in. There was a west entrance, but he never used it. So he always utilized this entrance that was allegedly a Canadian sidewalk with great disrepair. That's the essence of our comparative law, and he was recalled for rebuttal witnesses, and I asked him, can you tell me today, Mr. Weissbier, that this was a dangerous or unsafe sidewalk? And I already balked at him and said he never looked down, and he said, I can't tell you that. And that's the essence of our comparative law. One of the briefs, I know the court's read the briefs in there too, I'm happy to answer any other questions the court may have. We have none, thank you. I plead at the end of the day, there's nothing to overcome the manifest evidence of the jury, thank you. Just briefly, Your Honors, actually I just have two points. The first is that everything that I have written down, my full understanding is that we had no peremptories. We did not have any peremptories left when it came time to juror Kirkwood. And secondly, in regard to Jennifer Hanson, her testimony was that there were other factors involved in the reason for Mr. Lesner being fired from his job. But the fact that he missed, he had just been hired, the fact that he missed 10 days at work, and the fact that he was unable to go from one end of the store to the other like he needed to because he was in a brace, affected his ability  And so that clearly, the days missed at work due to this injury and his limited mobility with his ankle when he returned did impact the fact that he got fired. Thank you, we'll take the matter under advisement.